UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMELIA GOVEN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

SUPPORT PETS LLC,

Defendant.

CIVIL ACTION NO.: 26 Civ. 4226 (AT) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff Amelia Goven ("Goven") brings this putative consumer class action against Defendant Support Pets LLC ("SPL") for violations of New York General Business Law ("GBL") §§ 349 and 350, fraud, and unjust enrichment (the "Claims") arising from SPL's alleged deceptive sale of emotional support animal ("ESA") and psychiatric service dog ("PSD") products (the "Products"). (Dkt. No. 1 ¶ 1 (the "Complaint")). SPL moved to compel arbitration and dismiss or stay this action, (Dkt. Nos. 12–14; 16–17 (the "Motion"); see Dkt. No. 13-1 at 5), which Goven opposed. (Dkt. Nos. 15; 15-1).

For the reasons set forth below, the Motion is **GRANTED**, and this case is **STAYED** during the pendency of the arbitration.[1]

[1] We decide the Motion, which the Honorable Analisa Torres has referred (Dkt. No. 22), by opinion and order because a motion to compel arbitration and stay litigation is not a dispositive motion under 28 U.S.C. § 636(b)(1)(A). See, e.g., Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020) ("District courts in this Circuit regularly have concluded that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive and therefore within a Magistrate Judge's purview to decide without issuing a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b).") (collecting cases), objections overruled, No. 10 Civ. 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021); Zouras v. Goldman Sachs Grp., Inc., No. 02 Civ. 9249 (BSJ) (GWG), 2003 WL 21997745, at *1 (S.D.N.Y. Aug. 22, 2003) ("Because a motion to compel arbitration and stay an action is not a dispositive motion under 28 U.S.C. § 636(b)(1)(A), this Court will decide the defendants' motion pursuant to an opinion and order.").

## II. BACKGROUND

### A. Factual Background

We incorporate by reference the factual background set forth in the Court's Opinion and Order dated September 1, 2026, Goven v. Support Pets LLC, No. 26 Civ. 4226 (AT) (SLC), 2026 WL 2583128, at *1 (S.D.N.Y. Sept. 1, 2026) ("Goven I"), in which the Court stayed discovery pending resolution of the Motion, and set forth only the additional facts, primarily from the Complaint, necessary to decide the Motion.

#### 1. The Parties

Goven is a resident of New York. (Dkt. No. 1 ¶ 27). SPL is a Florida limited liability company that does business in New York. (Id. ¶¶ 14, 28, 30). Goven, a pet owner, purchased the Products from SPL's website (www.supportpets.com) (the "Website") in reliance on SPL's representations that the Products "were officially recognized, legally meaningful, and would provide legally significant documentation relating to [Goven] and her pet." (Id. ¶ 29).

Goven alleges that SPL deceptively advertises that it is an "Official ESA and PSD Provider[,]" and that the Products are legally required and officially recognized in obtaining rights related to ESAs or PSDs when in fact SPL has not been authorized by any governmental body, and the Products were not required by law and did not create or establish legal rights. (Dkt. No. 1 ¶¶ 23, 36). Goven further alleges that she, and others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), have been damaged by SPL's misconduct because they overpaid for the Products or would not have purchased them but for SPL's deceptive conduct. (Id. ¶¶ 15–26, 60–79).

**2. Goven's Interactions With the Website**

SPL states, and Goven does not dispute, that it keeps and maintains in the ordinary course of its business operations a database of records related to user interactions with the Website that are automatically generated by computer systems at the time of the interaction. (Dkt. No. 13 ¶ 4). On April 13, 2026, Goven completed the Website's questionnaire, which contained a disclosure confirming her agreement to the Website's terms (the "Terms") and in which she entered her email address. (Id. ¶ 6; see Dkt. No. 13-1 at 5). A screenshot of the Website's form field, in which Goven entered her email address on April 13, 2026, shows that before she entered her email address and clicked "Finish & Qualify Now[,]" she was informed that, "[b]y submitting you are agreeing to terms of the website and to be contacted by email, phone and/or SMS." (Dkt. No. 13 ¶ 6 (the "First Disclosure")). Within about 30 minutes of clicking "Finish & Qualify Now[,]" Goven purchased the Products and again submitted personally identifying information. (Id. ¶ 7).

The next day, on April 14, 2026, Goven returned to the Website by clicking on a hyperlink in an email sent to the email address she had provided the day before. (Dkt. No. 13 ¶ 8). As indicated in screenshots SPL has provided, Goven again entered her phone number and email address into the form fields on the Website, which disclosed that by doing so, she was agreeing to the Terms. (Id.) The screenshots reveal that on April 14, 2026, before Goven entered her email address and clicked "Calculate my results…[,]" she was presented with a second disclosure that stated, "[b]y submitting you are agreeing to the terms of the website and to be contacted by email" (id. (the "Second Disclosure")), and before she entered her phone number and clicked "Next[,]" she was presented with a third disclosure that stated:

> I agree to receive transactional and personalized marketing text messages from Support Pets at the cell number provided. Opt-in isn't required for purchase. Msgs may be automated. Reply STOP to cancel anytime, HELP for help. Msg & data rates may apply. Message frequency varies. See our Terms and Privacy Policy.

(Dkt. No. 13 ¶ 8 (the "Third Disclosure," together with the First and Second Disclosures, the "Disclosures")).

SPL states that "a user who clicked on that hyperlink [in the Third Disclosure] would have retrieved the Terms[.]" (Dkt. Nos. 13 ¶ 10; 13-1). Goven does not dispute her interactions with the Website on April 13, 2026 or April 14, 2026, and that she was presented with the Disclosures before entering her personal identifying information and clicking the action buttons. (See Dkt. No. 15).

**3. The Terms**

The Terms, which were in effect on April 13, 2026 and April 14, 2026, are governed by Florida law, (Dkt. No. 13-1 at 4), and contain a broad dispute resolution provision as follows:

> This Provision provides that all disputes between You and Us shall be resolved by binding arbitration because acceptance of these Terms constitutes a waiver of Your right to litigation claims and all opportunity to be heard by a judge or jury. We prefer this because We believe arbitration is less drama-filled than litigation. To be clear, there is no judge or jury in arbitration, and court review of an arbitration award is limited. The arbitrator must follow this agreement and can award the same damages and relief as a court (including attorney's fees). You may, however, opt-out of this Provision which means You would have a right or opportunity to bring claims in a court, before a judge or jury, and/or to participate in or be represented in a case filed in court by others (including, but not limited to, class actions). Everyone agrees that, except as provided below, any and all disputes, as defined above, whether presently in existence or based on acts or omissions in the past or in the future, will be resolved exclusively and finally by binding arbitration rather than in court in accordance with this provision.

(Dkt. No. 13-1 at 5 (the "Arbitration Provision")).[2]

On July 17, 2026, SPL published an updated version of the Terms (the "Updated Terms") on the Website. (Dkt. No. 17 ¶ 4). The Updated Terms are governed by New York law (Dkt. No. 15-1 at 22), and also contain a dispute resolution provision:

> The parties (and Covered Parties) hereby agree to arbitrate all claims that may arise under the Agreement. Without limiting the foregoing, should a dispute arise between you and either Support Pets[] or any Covered Part concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto: (a) each party agrees to submit their dispute for resolution by arbitration the American Arbitration Association ("AAA") in New York, NY, in accordance with the then current Commercial Arbitration rules of the AAA . . ."

(Dkt. No. 15-1 at 22–23 (the "Updated Arbitration Provision")).

The Updated Terms also contain a provision addressing what happens when SPL updates the Terms after a user has already interacted with the Website:

> We may amend the Agreement from time to time in our sole discretion, without specific notice to you; provided, however, that (a) any amendment or modification to the arbitration provisions, prohibition on class action provisions or any other provisions applicable to dispute resolution . . . shall not apply to any disputes incurred prior to the applicable amendment or modification.

(Dkt. No. 15-1 at 7 (the "Updated Terms Amendment")).

### B. <u>Procedural Background</u>

On May 20, 2026, Goven filed the Complaint. (Dkt. No. 1). On July 10, 2026, SPL filed the Motion. (Dkt. Nos. 12–14). In support of the Motion, SPL submitted a memorandum of law (Dkt. No. 14), a declaration of its Vice President of Operations, Nicole Hedmark ("Ms. Hedmark") (Dkt. No. 13 (the "Hedmark Declaration")), and a copy of the Terms. (Dkt. No. 13-1).

[2] SPL states that it "has no record of receiving any written notice from [] Goven opting out of the [Arbitration Provision] provided for in the Terms[.]" (Dkt. No. 13 ¶ 12). Goven does not dispute that she did not provide written notice to opt out of the Arbitration Provision. (<u>See</u> Dkt. No. 15).

On July 24, 2026, Goven filed her Opposition. (Dkt. No. 15). On July 31, 2026, SPL filed its reply (Dkt. No. 16), along with a reply declaration from Ms. Hedmark. (Dkt. No. 17 (the "Hedmark Reply Declaration")). On September 1, 2026, the Court granted SPL's request to stay discovery pending the Court's decision on the Motion. (Dkt. No. 23). See Goven I, 2026 WL 2583128, at *4.

## III. DISCUSSION

### A. Legal Standard

#### 1. Standard for Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") provides the circumstances when a court shall compel arbitration and stay all proceedings before it:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Ross v. Am. Express Co., 547 F.3d 137, 142 (2d Cir. 2008); see Green Tree

Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (noting the "liberal federal policy favoring arbitration agreements").[3]

"In determining whether to compel arbitration, the Court applies a standard similar to that used at summary judgment and must construe all reasonable inferences in favor of . . . the non-moving party." Palmer v. Starbucks Corp., 735 F. Supp. 3d 407, 415 (S.D.N.Y. 2024); see Barrows v. Brinker Rest. Corp., 36 F.4th 45, 49 (2d Cir. 2022) ("Because motions to compel arbitration are governed by a standard similar to that applicable for a motion for summary judgment, a court must draw all reasonable inferences in favor of the non-moving party."). The party resisting arbitration bears the burden to "prov[e] that the claims at issue are unsuitable for arbitration." Green Tree, 531 U.S. at 91. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983). "If the parties have in fact agreed to arbitrate, the district court must then stay proceedings." Montanus v. Columbia Mgmt. Inv. Advisers, LLC, No. 25 Civ. 2798 (PAE), 2025 WL 2503326, at *8 (S.D.N.Y. Sept. 2, 2025).

To determine whether to compel arbitration, courts perform a two-step inquiry based on contract principles that are "governed by state rather than federal law[.]" Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam).

**a. Step One**

At step one, the court considers "whether 'the parties enter[ed] into a contractually valid arbitration agreement.'" Gordon v. Wilson Elser Moskowitz Edelman & Dicker LLP, No. 22 Civ. 5212 (JPC) (JEW), 2023 WL 2138693, at *2 (S.D.N.Y. Feb. 21, 2023) (quoting Cap Gemini, 346 F.3d

[3] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.

at 365). "The party moving to compel arbitration has the initial burden of showing that the parties agreed to arbitrate." Citigroup Inc. v. Sayeg, No. 21 Civ. 10413 (JPC), 2022 WL 179203, at *5 (S.D.N.Y. Jan. 20, 2022). "While parties may agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, . . . parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." Id. Thus, "[t]o satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297 (2010).

### i. Mutual Assent

For an enforceable contract to exist under Florida law, there must be agreement as to all essential terms. See Giovo v. McDonald, 791 So. 2d 38, 40 (Fla. Dist. Ct. App. 2001).[4] The formation of a contract requires "mutual assent," i.e., a "meeting of the minds." Vision Palm Springs, LLLP v. Michael Anthony Co., 272 So. 3d 441, 444 n.3 (Fla. Dist. Ct. App. 2019). Mutual assent exists where the parties to a contract objectively manifested their intent to be bound contractually. See id. at 447.

[4] As explained below, the Terms govern Goven's transaction with SPL. (See III.B, infra). Given that the Terms contain a Florida governing law provision, we apply Florida law. (Dkt. No. 13-1 at 4). Even if the Updated Terms governed Goven's transaction, however, New York law is substantially the same as Florida law on mutual assent. See, e.g., Compass Prods. Int'l LLC v. Charter Commc'ns, Inc., 22 Civ. 254, 2023 WL 2358479, at *2 (2d Cir. Mar. 6, 2023) ("Under New York law, [the party attempting to enforce a contract] must establish there was a meeting of the minds on all essential terms [], demonstrating the parties' mutual assent and mutual intent to be bound.").

**ii. Internet Agreements**

"Florida recognizes two categories of internet agreements: clickwrap agreements and browsewrap agreements." Tejon v. Zeus Networks, LLC, 174 F.4th 1322, 1326 (11th Cir. 2026).[5] "A clickwrap agreement requires a user to check a box or click a button to acknowledge acceptance of the agreement's terms and conditions. By contrast, a browsewrap agreement contains hyperlinked terms, and the user's consent is implied by continued use of the website." Id. Florida courts will enforce browsewrap agreements where the "purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." Id. (citing MetroPCS Commc'ns Inc. v. Porter, 273 So. 3d 1025, 1028 (Fla. Dist. Ct. App. 2018)).

Agreements that fall between the two categories are typically referred to as hybridwrap agreements. See Martin v. Lens.com, Inc., No. 24 Civ. 60489 (DSL), 2024 WL 4826048, at *3–4 (S.D. Fla. Nov. 19, 2024) ("Hybrid-wrap agreements fall somewhere between [clickwrap and browsewrap agreements]."); MetroPCS, 273 So. 3d at 1028 ("The agreement in this case does not precisely fit within either category [clickwrap or browsewrap], although it is akin to a browsewrap agreement in that [defendant] completed his transaction with [plaintiff] without visiting the web page containing the terms and conditions.").[6] Hybridwrap agreements "merely

[5] New York law also recognizes clickwrap and browsewrap agreements. See, e.g., Meyer v. Uber Techs., Inc., 868 F.3d 66, 75 (2d Cir. 2017) (explaining that "'clickwrap' (or 'click-through') agreements, [] require users to click an 'I agree' box after being presented with a list of terms and conditions of use, [while] "browsewrap" agreements [] generally post terms and conditions on a website via a hyperlink at the bottom of the screen.").

[6] New York law is substantially the same as Florida law regarding hybridwrap agreements, requiring that the agreement must have been "reasonably communicated to the user" to be valid. Meyer, 868 F.3d at 76; see Soliman v. Subway Franchisee Advert. Fund Tr., Ltd., 999 F.3d 828, 834 (2d Cir. 2021) ("We have held that, even where the offeree does not have actual notice of the contract terms [and conditions on SPL's website], she will still be bound by such terms if a 'reasonably prudent' person would be on inquiry

present the user with a hyperlink to their terms and conditions, and display some form of notice of deemed acquiescence." Martin, 2024 WL 4826048, at *4. "Under this type of agreement format, an offeree does not have actual notice of certain contract terms, [but] [s]he is nevertheless bound by such terms if [s]he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." Id. Hybridwrap agreements are enforced where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." Id.

**b. Step Two**

At step two, the court asks, "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." Citigroup, 2022 WL 179203, at *5. "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Gordon, 2023 WL 2138693, at *2 (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019)). If it does not, then the court considers whether "the parties' dispute fall[s] within the scope of the arbitration agreement[.]" Cap Gemini, 346 F.3d at 365. To show "clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator[,]" parties may point to provisions of an arbitration agreement

---

notice of those terms and she unambiguously manifested assent to those terms."); Starke v. Gilt Groupe, Inc., No. 13 Civ. 5497 (LLS), 2014 WL 1652225, at *2–3 (S.D.N.Y. Apr. 24, 2014) (holding that arbitration clause in "terms of use" were binding where consumer clicked "Shop Now" button next to statement that informed user that "the consumer will become a Gilt member and agrees to be bound by the "'Terms of Membership,'" which were available next to the button as a hyperlink).

"explicitly incorporat[ing] procedural rules that empower an arbitrator to decide issues of arbitrability[.]" DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th 308, 318 (2d Cir. 2021).

**2. Failure to Arbitrate**

After the two-step inquiry, the Court examines whether "one party to the agreement has failed, neglected or refused to arbitrate." Beijing Shougang Mining Inv. Co., Ltd. v. Mongolia, 11 F.4th 144, 162 (2d Cir. 2021). "A party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." Id. (citation modified).

**B. Application**

As explained below, we find that the parties have entered into a valid agreement to arbitrate, and that pursuant to the Terms, which govern Goven's transaction, the parties have delegated the issue of arbitrability to the arbitrator. Accordingly, we **GRANT** the Motion, **COMPEL** Goven to arbitrate her claims pursuant to the Terms, and **STAY** this action during the pendency of the arbitration.

**1. Step One — Valid Agreement to Arbitrate**

We first consider whether "the parties enter[ed] into a contractually valid arbitration agreement[.]" Cap Gemini, 346 F.3d at 365. SPL argues that the Court should compel Goven to arbitrate her Claims and either dismiss the Claims without prejudice or stay this dispute pending the conclusion of the arbitration because on April 13, 2026 and April 14, 2026, through her interactions on the Website, Goven assented to the Terms, which contain the Arbitration Provision. (Dkt. Nos. 13–14). Although Goven does not dispute the existence of the Terms or that she interacted with the Website in the way that SPL describes on April 13, 2026 and

April 14, 2026 (see Dkt. Nos. 13; 15), Goven argues that SPL has failed to establish whether the Terms or the Updated Terms governed Goven's transaction, and therefore "cannot establish that [Goven] agreed to arbitrate under the particular provisions [SPL] now seeks to enforce." (Dkt. No. 15 at 14–15; 15-1).

As an initial matter, Goven incorrectly asserts that SPL "nowhere explains which version was presented to [her.]" (Dkt. No. 15 at 16). SPL shows in the Hedmark Declaration that "[c]licking on the underlined Terms hyperlink included in the [Third] [D]isclosure opens up a new window containing the website's Terms[,]" which are Exhibit A to the Hedmark Declaration. (Dkt. Nos. 13; 13-1). In the Hedmark Reply Declaration, SPL further states that the Terms were in effect on April 13, 2026 and April 14, 2026, and that SPL published the Updated Terms on July 17, 2026. (Dkt. No. 17 ¶¶ 3–4). The fact that SPL may have updated the Terms after Goven agreed to them has no bearing on the enforceability of the Terms — which contain the Arbitration Provision — on Goven, especially where the Updated Terms Amendment provides that any amendment "shall not apply to any disputes incurred prior to the applicable amendment or modification." (Dkt. No. 15-1 at 7).[7]

Even if the Updated Terms governed Goven's transaction with SPL, however, the Updated Terms also contain the Updated Arbitration Provision requiring Goven to arbitrate her Claims. (Dkt. No. 15-1 at 22–23). Goven argues that the Terms and the Updated Terms contain different "governing-law provisions, [] arbitral fora, [] dispute-resolution procedures, [] pre-arbitration

[7] SPL admits that in its Motion it quoted the Updated Terms rather than the Terms but reiterates that the Terms were the "operative agreement" on April 13, 2026 and April 14, 2026 and therefore govern Goven's transaction with SPL. (Dkt. No. 16 at 8). The drafting error in the Motion does not change the Court's conclusion that the Terms governed Goven's interactions with the Website on April 13, 2026 and April 14, 2026. (See id.)

requirements, [] attorney-fee provisions, [] limitations on available remedies and materially different opt-out mechanisms." (Dkt. No. 15 at 16–17). As SPL correctly points out, however, those differences "represent differences in how the arbitration will proceed, not whether the arbitration will proceed in the first instance." (Dkt. No. 16 at 5).

In assessing whether the Disclosures in the Terms were "reasonably conspicuous" to provide sufficient notice to Goven that she would be bound by the Terms, we note that the Disclosures were in "dark font color" and were "proximately locat[ed] to the only call to action button[.]" (Dkt. No. 14 at 20). Goven assented to the Terms by submitting a "variety of personally identifiable information across multiple discrete areas of the Website, . . . [where] [Goven] was presented with [the] [D]isclosures notifying her that by taking [those actions], she would be manifesting her assent to the Terms." (Dkt. Nos. 13 ¶¶ 6, 8; 14 at 20). This represents a hybridwrap agreement similar to those that other courts have enforced under these circumstances. See Martin, 2024 WL 4826048, at *5–7 (enforcing defendant's terms of use where the notice "By continuing you agree to our Terms of Use & Privacy Policy" was in black font set against a white background and the hyperlink text was underlined, and plaintiff clicked the "Continue" button); see also MetroPCS, 272 So. 3d at 1029 ("[A] person has no right to shut his eyes or ears to avoid information, and then say that [s]he has no notice."); Sapp v. Warner, 105 Fla. 245, 255 (Fla. 1932) ("[I]t will not suffice the law to remain willfully ignorant of a thing readily ascertainable by whatever party puts [her] on inquiry, when the means of knowledge is at hand."). The Third Disclosure, which contained the hyperlinked Terms, gave Goven "the opportunity to click on the Terms [], read [them] [] and decline to continue to process the transaction." Martin, 2024 WL 4826048, at 7. Even if Goven did not actually see the Third

Disclosure, "'actual knowledge'" has for all practical purposes been replaced with 'inquiry notice' as far as manifesting assent to online agreements." Id.

Accordingly, Goven entered into a valid agreement to arbitrate her Claims against SPL when, on April 13, 2026 and April 14, 2026, Goven entered her personal identifiable information into the Website's form fields after being presented with the Disclosures, thus manifesting her assent to the Terms. (See Dkt. Nos. 13–14).

**2. Step Two — Arbitrability**

We now turn to step two — whether the Court or an arbitrator should decide whether the Claims fall within the scope of the Arbitration Provision. (See ¶ III.A.1.b, supra). Here, the Terms clearly and unmistakably delegate the issue of arbitrability to the arbitrator by stating that "[a]ll issues shall be for the arbitrator to decide, including the scope of this Provision." (Dkt. No. 13-1 at 5). Accordingly, the arbitrator, not this Court, must determine arbitrability. See Citigroup, 2022 WL 179203, at *5; Spates v. Uber Techs., Inc., No. 21 Civ. 10155 (ALC), 2023 WL 3506138, at *3 (S.D.N.Y. Mar. 31, 2023) (finding clear and unmistakable evidence of delegation to the arbitrator where the arbitration provision provided that "the arbitrator . . . shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this [a]rbitration [a]greement, including any claim that all or any part of this [a]rbitration [a]greement is void or voidable[,]" and "shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the [t]erms are unconscionable . . .").

**3. Refusal to Arbitrate**

By filing the Complaint, Goven has refused to arbitrate. (Dkt. No. 1). See Beijing, 11 F.4th at 162 ("A party has refused to arbitrate if [she] commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so.") (citation modified); Gordon, 2023 WL 2138693, at *3, 9 (same).

* * *

Accordingly, because Goven entered into a valid agreement to arbitrate her claims, pursuant to which arbitrability is a question for the arbitrator, Goven must arbitrate her Claims against SPL.

**C. This Action is Stayed Pending the Arbitration**

Having found that the Claims must be referred to arbitration, and SPL having requested a stay of this action pending the arbitration, (Dkt. Nos. 12; 14 at 26), we stay the action during the pendency of the arbitration. See Smith v. Spizzirri, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, [Section] 3 of the FAA compels the court to stay the proceeding."); LeDeatte v. Horizon Media, 571 F. Supp. 3d 72, 77 (S.D.N.Y. 2021) ("[T]he FAA mandate[s] a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").

**IV. CONCLUSION**

For the reasons stated above, the Court **ORDERS** that (i) the Motion is **GRANTED**, (ii) Goven is **COMPELLED** to arbitrate her claims pursuant to the Terms, and (iii) this case is **STAYED** during the pendency of the Arbitration. The parties shall file a joint letter setting forth the status

of the arbitration by **December 14, 2026,** and **every 60 days thereafter** until the arbitration has concluded.

The Clerk of Court is respectfully directed to close Dkt. No. 12.

Dated: New York, New York
October 14, 2026

SO ORDERED.

**SARAH L. CAVE**
**United States Magistrate Judge**